OPINION *Page 2 
{¶ 1} Appellant Nicole Hess ("Mother") appeals the August 22, 2007 Judgment Entry, and August 22, 2007 Findings of Fact and Conclusions of Law entered by the Stark County Court of Common Pleas, Juvenile Division, which terminated her parental rights, privileges and responsibilities with respect to her minor son, and granted permanent custody of the child to the Stark County Department of Job and Family Services ("Department"). Appellant Jeffrey Hess ("Grandfather") appeals the same with respect to the trial court's decision not to place the minor child in his custody.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On April 4, 2005, the Department filed a Complaint in the Stark County Court of Common Pleas, Juvenile Division, alleging Xavier Hess (DOB 8/4/04) was a dependent and neglected child. The Complaint was filed simultaneously with another complaint which sought emergency temporary custody of Mother, a minor herself, and her siblings. The trial court conducted an emergency shelter care hearing on April 5, 2005. The trial court found probable cause existed for the Department's removal of Xavier from his home, and continued emergency temporary custody of the child with the Department.
 {¶ 3} Via Order filed April 4, 2005, the trial court ordered Grandfather to submit to an evaluation at Melymbrosia, which was to be completed by the adjudicatory hearing, and he was to follow all recommendations. The trial court also required Grandfather to receive a drug and alcohol abuse assessment and follow all recommended treatment; and submit to a urinalysis within the next forty-eight hours. *Page 3 
 {¶ 4} The trial court conducted an adjudicatory hearing on May 4, 2005, and found Xavier to be dependent as to Mother; Gary Thomas, alleged father; John Doe, alleged father; Grandfather; and Martha Jones, paternal great-grandmother. The trial court continued temporary custody of the child with the Department. At the semi-annual review hearing on September 29, 2005, the trial court approved and adopted the case plan, and ordered the status quo. The trial court also modified a prior no contact order to allow supervised visits between Xavier and Grandfather. Mother made some progress on her case plan, being cooperative, and attending school and counseling appointments. The trial court granted the Department an extension of temporary custody on April 20, 2006.
 {¶ 5} After the Department filed a Motion for Planned Permanent Living Arrangement on August 1, 2006, the trial court conducted a hearing at which the parties stipulated to PPLA status for Xavier. However, as a result of Mother's behavior, the placement was disrupted after one month. The department filed a Motion for Permanent Custody on December 13, 2006. The trial court conducted a hearing on the motion on January 22, February 21, and April 5, 2007.
 {¶ 6} Elizabeth Parsons, the ongoing family caseworker, testified the Department had been involved with the Hess family since 1992. Parsons explained, after the Department was awarded temporary custody of Xavier, he and Mother were placed together from April, 2005, through June 13, 2005. After Mother was removed from that placement, Xavier moved to a new foster home, where he remained until *Page 4 
August, 2006. At that time, Xavier was placed in a joint foster placement with Mother. However, in September, 2006, Xavier was placed back in the original foster home.
 {¶ 7} With respect to Grandfather, Parsons indicated he had had some visits with Xavier, but not on a regular basis. Although he had known of, and been invited to visits, Grandfather had not visited Xavier since July, 2006. Grandfather told her his failure to attend the visits was due to a lack of transportation. The Department provided Grandfather with bus passes for more than six months. Typically, the Department provides its clients with only three months of bus passes.
 {¶ 8} Mother's case plan required her to attend individual counseling, and attend a Department approved parenting program, desirably Goodwill Parenting. The case plan also addressed the Department's concerns with Mother's supervision of Xavier. When asked about Mother's compliance with the case plan objectives, Parsons stated Mother had individual counseling through Child and Adolescent Service Center. Initially, the Department had a lot of difficulty with her as Mother refused to take any responsibility for her decisions or actions which placed Xavier or herself at risk. After Mother's counselor left Child and Adolescent Service Center, Mother was placed on a waiting list for a new counselor. Mother was very resistant to return to counseling as she did not feel such would be beneficial to her. While placed in a Boys Village foster home, Mother began counseling through Boys Village. Mother exhibited a great deal of disrespectful attitude for the counselors. Mother attended a summer group counseling session through Boys Village, which focused on anger related issues, respect issues, and rule following. After the group finished prior to the start of the school year, the case manager at Boys Village, who was also working with the family, left that agency. Mother *Page 5 
was again without a counselor. At the end of September, 2006, Mother began counseling with Dr. Cynthia Keck-McNulty at Northeast Ohio Beneficial Health.
 {¶ 9} Mother began Goodwill Parenting in March, 2006, and completed the program in June, 2006, receiving a certificate of completion as well as a nutrition certificate. Mother had perfect attendance and completed 100% of her goals. The parenting instructors had concerns about Mother's behavior pattern at visits as she would merely follow Xavier around, but not interact or engage the child. Mother improved in this area after receiving hands-on assistance from the parenting instructor.
 {¶ 10} Parsons detailed the objectives of Grandfather's case plan. The Department requested Grandfather undergo a psychological evaluation. Numerous recommendations for treatment were made as a result of the evaluation. The recommendations included ongoing intensive anger management through individual counseling; working on mood and coping skills; addressing substance abuse issues; completing a Quest evaluation and submitting to urine screens; and a psychiatric evaluation to see if medication was necessary. The recommendations were incorporated into Grandfather's case plan.
 {¶ 11} Grandfather completed a drug and alcohol assessment through Trillium in September, 2006. He completed a psychological evaluation in September, 2005, and a psychiatric evaluation in February, 2006. At the time of the hearing, Grandfather was engaged in anger management and individual counseling as well as drug and alcohol counseling. Grandfather was diagnosed as bipolar and prescribed appropriate medication. Parsons noted there was a lot of delay getting Grandfather started with services. Although Grandfather initiated services through Community Services in *Page 6 
October, 2005, he failed to return to the provider until January, 2006. Grandfather also failed to engage in therapy until February, 2006, and did not make active progress and change until August, 2006.
 {¶ 12} Parsons explained, although Grandfather had been making active, positive strides, the Department was not willing to place Xavier with him. Some of the reasons for this decision included Grandfather's previous history with the Department, which was quite extensive and included his own three daughters being removed from his custody due to ongoing concerns. Additionally, Grandfather completed case plan services during the Department's prior involvement with the family, however, he was unable to maintain significant change and consistency after the services were completed. Parsons conducted a home study on Grandfather's residence in October, 2006, but was unable to approve the home due to its conditions. Grandfather was subsequently evicted from that residence and had moved into a new home approximately two months prior to the hearing. Although the new residence was in good condition when Parsons visited in January, 2007, she expressed concerns about how the home would look after Grandfather had resided there for a period of time.
 {¶ 13} Dr. Cynthia Keck-McNulty, a clinical therapist with Northeast Ohio Behavioral Health, testified she began working with Mother on September 28, 2006. After conducting a diagnostic assessment of Mother, Dr. Keck-McNulty diagnosed her with oppositional defiant disorder, and also found Mother had anger management problems. Mother was initially scheduled for weekly appointments, however, between September, 2006, and the date of the hearing, the doctor had only seen her seven *Page 7 
times. Dr. Keck-McNulty stated she had seen improvement in Mother's behaviors and an improvement in their relationship, but noted she and Mother were not going to be able to make any positive progress until the two developed a trusting relationship. The doctor added due to the drop off in Mother's attendance, she felt she was back at square one with Mother. Through discussions with Mother's grandmother, the doctor discovered Mother had ongoing anger and compliance issues. Mother described domestic violence as well as drug and alcohol abuse by her parents while she was living in their home. Dr. Keck-McNulty stated Mother's family currently provides her with a support system and she has learned her parenting skills from them. The doctor added those parenting skills, however, were not healthy or appropriate. Dr. Keck-McNulty testified she had concerns about Mother's ability to parent Xavier at this point in time.
 {¶ 14} Grandfather called Jamie Mangus, a family educator with Healthy Tomorrow's Help Me Grow Program, to testify on his behalf. Mangus stated she has been working with Grandfather and his family for approximately three years. She added she has spent a significant amount of time with the family in their home. Mangus commented she is pleased with the growth in the relationships she has observed. Grandfather's home is clean and appropriate. Currently, Grandfather and his fiancée, Heather Menegay, live in a home with Grandfather's teenage daughter, Ashley, Mother's sister, who was recently returned to the home by the Department; Grandfather and Heather's child; and Heather's two children from a previous relationship. Mangus found Grandfather and Heather's relationship to be very supportive, and noted the couple gets along very well. During the course of her involvement with the family, *Page 8 
Mangus has observed Grandfather become more considerate, and much more involved and interactive with the children.
 {¶ 15} Grandfather also called Laurel Manley, a service coordinator with Healthy Tomorrow's Help Me Grow Program, who testified she visits Grandfather's home at least once a month. Manley stated Grandfather and his fiancée interact well and work together well in raising their children. Grandfather interacts well with his fiancée's two children as well as his young son, Jeffrey. Manley was emphatic in her opinion if Xavier was allowed to live with Grandfather, the family would love him and take care of him. On cross-examination, Manley acknowledged Grandfather smokes, but since moving into his new home he only smokes outside.
 {¶ 16} Bruce Hord, guardian ad litem for Xavier, testified, based upon the investigation he completed, he did not feel Mother would be the best placement for Xavier. Hord explained Mother is a sixteen year old girl and has maturity problems. Hord added Mother does not have the resources to help her. Mother's lack of maturity and lack of resources affect her ability to parent Xavier.
 {¶ 17} The trial court conducted the best interest portion of the hearing on July 9, 2007. Elizabeth Parsons, the ongoing family case worker assigned to the matter, testified Xavier is a 2 ½ year old bi-racial boy without any developmental problems. Parsons added Xavier was not only on target developmentally, but also actually exceeded the expectations for a child of his age. Parsons noted recently Xavier has exhibited behavioral issues surrounding visitation and after visitation. The significant issue with Xavier was toilet training, and he would regress in that area after visitation. Xavier becomes very defiant and is aggressive with adults and other children. The boy *Page 9 
becomes difficult to discipline. He behaves in the same manner at visitations with Mother. Parsons explained these behaviors began recently, following visitation. Xavier's only medical problem is asthma for which he receives treatment as necessary.
 {¶ 18} Parsons stated Xavier has been in the Department's custody since April, 2005. Initially, Xavier was placed together with Mother. However, Mother was removed from that placement due to her disruptive behavior, and Xavier was removed shortly thereafter. Xavier went to an emergency placement for approximately five days, and then went to the home of his current foster parents. After fourteen months, the Department again attempted to transition Xavier into a foster home with Mother. That placement lasted approximately 1 ½ months prior to Mother's disrupting the situation. The Department subsequently placed Xavier back with his foster family where he has been since September, 2006. Xavier's foster family is interested in adopting him. Parsons observed the home on multiple occasions and found it extremely appropriate for the child. Xavier is well adjusted and bonded to his caregivers and the other children in the home. Xavier also interacts very well with the extended family of his foster parents.
 {¶ 19} The Department attempted to place Xavier with relatives, but none of them were approved. With respect to Grandfather, Parsons noted he had come forward several times throughout the course of the proceedings. After Grandfather approached the Department in October, 2006, Parsons conducted a home study of his residence. Parsons recalled, at that time, Grandfather was more focused on Mother and getting her out of foster care than on Xavier. His primary goal at the time was Mother. Parsons also found the home conditions inappropriate for Xavier. *Page 10 
 {¶ 20} Grandfather again approached the Department at the beginning of 2007, and asked to be considered for placement. Parsons conducted an announced home visit of Grandfather's new residence and found it immaculate, well kept and well maintained. Parsons was surprised with the condition of the home based upon what she had observed during her visit to the prior home in October, 2006. On April 2, 2007, Parsons conducted an unannounced home visit and found the home in extremely poor condition. When Parsons knocked on the door, Grandfather hollered for her to enter. She announced herself so Grandfather would know who was walking into his home. Grandfather and two male friends were in the living room. Outside the home, she observed piles of trash on the porch, litter throughout the yard and an entire trashcan filled solely with empty beer cans. When she entered the home, Parsons noticed trash and food scattered about the entry. Parsons observed cigarette butts and ashes throughout the entire first floor of the home despite the "no smoking" sign on the front door. Trash and food were strewn about the kitchen and dining room. Grandfather explained the poor condition of the home was the result of his breaking his ankle approximately three days prior to the visit. Parsons stated the extreme condition of the home could not have been achieved in seventy-two hours.
 {¶ 21} Parsons testified there are currently six people living in Grandfather's home. Specifically, Grandfather; Heather Menegay, Grandfather's fiancée; Ashley, Grandfather's teenage daughter; Heather's two children from a previous relationship; and Heather and Grandfather's child, who is approximately two years old. Grandfather and the family have been consistently visiting Xavier since March, 2007. Grandfather *Page 11 
was aware of the every two week visitation schedule from the onset of the case, however, he did not visit Xavier during the course of 2006.
 {¶ 22} Via Judgment Entry filed August 22, 2007, the trial court terminated Mother's parental rights, responsibilities and privileges with respect to Xavier and granted permanent custody of the child to the Department. The trial court also issued Findings of Facts and Conclusions of Law with respect to the best interest portion of the proceeding.
 {¶ 23} It is from the August 22, 2007 Judgment Entry, and August 22, 2007 Findings of Fact and Conclusions of Law, Mother and Grandfather appeal.
 {¶ 24} Mother raises the following assignments of error:
 {¶ 25} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILDREN CANNOT OR SHOULD NOT BE PLACED WITH THE APPELLANT WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 26} "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 27} "III. THE TRIAL COURT ERRED IN ITS DETERMINATION THAT THE STARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES PUT FORTH GOOD FAITH AND DILIGENT EFFORTS TO REHABILITATE THE FAMILY SITUATION. *Page 12 
 {¶ 28} "IV. THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING NOT EXCLUDING TESTIMONY FROM A WITNESS THAT VIOLATED A SEPARATION OF WITNESSES ORDER."
 {¶ 29} Grandfather asserts as error:
 {¶ 30} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY, FINDING THAT NO APPROPRIATE RELATIVES WERE WILLING AND ABLE TO CARE FOR THIS CHILD, WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."
 {¶ 31} This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.1(C).
 MOTHER I, II {¶ 32} In her first assignment of error, Mother contends the trial court's finding Xavier could not or should not be placed with her within a reasonable time was against the manifest weight and sufficiency of the evidence. In her second assignment of error, Mother maintains the trial court's finding it would be in Xavier's best interest to grant permanent custody to the Department was against the manifest weight and sufficiency of the evidence.
 {¶ 33} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of *Page 13 
the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978),54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 34} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 35} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 36} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of *Page 14 
the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 37} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 38} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C.2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 39} In the case sub judice, the trial court found Xavier had been in the temporary custody of the Department for 12 or more of the past consecutive 22 months, and the child could not be placed with Mother within a reasonable time. Those findings are alternate findings under R.C. 2151.414(B)(1). R.C. 2151.414(B)(1)(d) and (a), respectively. Either of those findings, if supported by the evidence, would have been sufficient, in and of itself, to base a grant of permanent custody pursuant to R.C. 2151.414(B)(1). *Page 15 
 {¶ 40} Mother does not appeal the trial court's finding Xavier was in the temporary custody of the Department for 12 or more of the past consecutive 22 months. Again, such a finding is enough to satisfy the requirements of R.C. 2151.414(B)(1). See In re: Whipple Children, Stark App. No. 2002CA00406, 2003-Ohio-1101. However, because the trial court made a finding Xavier could not be placed with Mother within a reasonable time, we shall review such finding.
 {¶ 41} As set forth in our Statement of the Facts and Case, supra, although Mother did attend counseling, she showed little insight into her actions. She was unwilling to take responsibility for her actions. Mother's current therapist, Dr. Keck-McNulty noted no significant improvements in Mother's behavior, and Mother had not been consistent in attending her sessions. Mother completed her Goodwill parenting classes, and met her goals. The staff observed positive changes in her interactions with Xavier during visitation, however, remained concerned about Mother's ability to separate herself from negative influences and maintain stability. The Department, on at least two occasions, attempted to place Mother and Xavier in the same placement. Those placements were disrupted due to Mother's behavior. Mother left Xavier outside, unattended, in order to smoke a cigarette. Although Mother is aware of Xavier's asthma and history of respiratory infections, she, nonetheless, smokes in the child's presence, which exacerbates his medical condition.
 {¶ 42} Elizabeth Parsons testified Xavier is a 2 ½ year old bi-racial boy with no developmental problems. Xavier has recently exhibited regression in toilet training and aggression with other children and his teachers. These behaviors occur following visits with Mother, and quickly subside when he returns to his foster family. Xavier is well- *Page 16 
adjusted and bonded with his foster family. He was placed in the temporary custody of the Department in April, 2005, and with the exception of a couple of months, had lived with his current foster family. The family is willing and able to adopt Xavier.
 {¶ 43} Based upon the foregoing and the entire record in this matter, we find the trial court's findings Xavier could not or should not be placed with Mother within a reasonable time, and it was in his best interest to grant permanent custody to the Department are not against the manifest weight or sufficiency of the evidence.
 {¶ 44} Mother's first and second assignments of error are overruled.
 MOTHER III {¶ 45} In her third assignment of error, Mother challenges the trial court's determination the Department used reasonable efforts to assist her in completing the case plan and reasonable efforts to prevent the removal of Xavier.
 {¶ 46} Pursuant to R.C. 2151.419, the agency which removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home, or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts.
 {¶ 47} R.C. 2151.419 is generally not applicable to permanent custody proceedings. In re C.F., 113 Ohio St.3d 73, 81, 2007-Ohio-1104 (Citation omitted). Nonetheless, we find the Department did make reasonable efforts. The Department implemented a comprehensive reunification plan to assist Mother in remedying the problems which caused Xavier to be removed. The case plan required Mother to attend individual counseling, and complete parenting educational and instructional courses at *Page 17 
Goodwill. Despite working on the case plan, Mother showed no significant improvements in her behavior. Attempts at reunification were repeatedly thwarted by Mother's defiant attitude. The trial court found the Department had made all reasonable, diligent efforts and had worked with Mother with no significant improvement.
 {¶ 48} Although the trial court was not required to make a reasonable effort determination, based upon our review of the record, we find substantial evidence to establish the Department used reasonable efforts to reunify the family, but Mother made no significant progress toward alleviating the Department's core concerns for Xavier.
 {¶ 49} Mother's third assignment of error is overruled.
 MOTHER IV {¶ 50} In her final assignment of error, Mother submits the trial court abused its discretion in failing to exclude the testimony of a witness who violated the separation of witnesses order.
 {¶ 51} Evid. R. 615 states: "(A) Except as provided in division (B) of this rule, at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. An order directing the "exclusion" or "separation" of witnesses or the like, in general terms without specification of other or additional limitations, is effective only to require the exclusion of witnesses from the hearing during the testimony of other witnesses.
 {¶ 52} "(B) This rule does not authorize exclusion of any of the following persons from the hearing:
 {¶ 53} "(1) a party who is a natural person; *Page 18 
 {¶ 54} "(2) an officer or employee of a party that is not a natural person designated as its representative by its attorney;
 {¶ 55} "(3) a person whose presence is shown by a party to be essential to the presentation of the party's cause;
 {¶ 56} "(4) in a criminal proceeding, a victim of the charged offense to the extent that the victim's presence is authorized by statute enacted by the General Assembly. "As used in this rule, "victim" has the same meaning as in the provisions of the Ohio Constitution providing rights for victims of crimes." Evid. R. 615.
 {¶ 57} The exclusion of witnesses from the courtroom is within the sound discretion of the trial judge, and the exercise of that discretion will not be disturbed absent clear abuse. E.g., DeRosier v. UnitedStates (8th Cir.1969), 407 F.2d 959, 961; Powell v. United States (6th Cir.1953), 208 F.2d 618, 619; cert. denied, 347 U.S. 961, 74 S.Ct. 710,98 L.Ed. 1104 (1954).
 {¶ 58} In the case at bar, the trial court ordered a separation of witnesses. Dr. Cynthia Keck-McNulty entered the courtroom after this ruling, and was unaware of such. Attorneys for the parties were unaware of her entrance or presence. Mother has shown no evidence to the contrary. Further, Mother has failed to establish how Dr. Keck-McNulty's presence during the testimony of Elizabeth Parsons prejudiced her in any way.
 {¶ 59} Mother's fourth assignment of error is overruled. *Page 19 
 GRANDFATHER I {¶ 60} In his sole assignment of error, Grandfather argues the trial court's finding no appropriate relatives were willing and able to care for Xavier was against the manifest weight and sufficiency of the evidence.
 {¶ 61} A trial court may grant permanent custody only upon a showing by clear and convincing evidence an award of permanent custody is in the child's best interest. R.C. 2151.414(D). In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 62} R.C. 2151.412(G) sets forth the general priorities to be applied by a public children's services agency with regard to case plans. R.C. 2151.412(G)(2) provides if a child cannot be placed in the legal custody of his parents, the child should be placed "in the legal custody of a suitable member of the child's extended family[.]" However, "Ohio's Courts have consistently recognized the language in R.C.2151.412(G) is precatory, not mandatory * * * [R.C. 2151.412] does not command the juvenile court to act in a specific manner. Instead, the statute sets out general, discretionary priorities to guide the court. So while the guidelines may be helpful to the juvenile court, it is not *Page 20 
obligated to follow them". See, In Re: Halstead, Columbiana App. No. 04CO37, 2005-Ohio-403; In re: Hyatt (1993), 86 Ohio App.3d 716, 722.
 {¶ 63} During the course of the proceedings, Grandfather approached the Department on at least two occasions seeking custody of Xavier. Elizabeth Parsons visited Grandfather's home from which he was subsequently evicted, in October, 2006. The home was not appropriate. Additionally, Grandfather's main objective at that time was to have Mother returned to him. His focus was not on his grandchild. Grandfather moved in January, 2007, and again asked the Department to consider him for placement. Parsons visited the home, and found it to be clean and well-maintained. However, Parsons made an unannounced visit in early April, 2007, and found the home to be in deplorable condition. Parsons also referred to Grandfather's long history with the Department which involved his own children, and his failure to make improvements despite on-going services. Grandfather had only visited Xavier four or five times during the course of the proceedings.
 {¶ 64} Based upon the foregoing and the entire record in this matter, we find the trial court's finding there was no appropriate relative placement for Xavier was not against the manifest weight or sufficiency of the evidence.
 {¶ 65} Grandfather's sole assignment of error is overruled. *Page 21 
 {¶ 66} The Judgment of the Stark County Court of Common Pleas, Juvenile
Division is affirmed.
 Hoffman, P.J., Wise, J. and Edwards, J. concur *Page 22 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the Judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to the respective Appellants in each case. *Page 23 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the Judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to the respective Appellants in each case. *Page 1